**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **BARBARA J. WULF** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 09 C 6505** |
| **v.** ) | |
| ) | **Magistrate Judge Sheila Finnegan** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Barbara Wulf brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Administrative Law Judge ("ALJ")'s decision denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and on March 11, 2010, Plaintiff moved for summary judgment, seeking reversal of the ALJ's decision. The Commissioner of Social Security ("Commissioner") filed a cross-motion for summary judgment arguing that the ALJ's decision should be upheld. On April 26, 2010, the case was reassigned to this Court for all further proceedings. After careful review of the parties' briefs and the record, the Court now grants Plaintiff's motion for summary judgment, denies the Commissioner's motion for summary judgment, and remands the matter for further proceedings consistent with this ruling.

## PROCEDURAL HISTORY

On March 27, 2006, Plaintiff applied for DIB and SSI, alleging she became disabled as of June 16, 2005 due to injuries sustained in a motor vehicle accident resulting in muscle, ligament, and nerve damage to her neck and chronic pain. (R. 121, 180). Her application was denied initially on May 18, 2006 and again on reconsideration on September 13, 2006. (R. 62, 73). Pursuant to Plaintiff's request, ALJ John Pope held an administrative hearing on April 15, 2008. (R. 37). Plaintiff appeared at the hearing with a non-attorney representative from Advantage Health Consultants. (R. 39). Plaintiff and a vocational expert testified at the hearing.

On October 10, 2008, the ALJ found that Plaintiff was not disabled, and the Appeals Council subsequently denied Plaintiff's request for review. (R. 11, 26-36). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In support of her motion, Plaintiff argues that the ALJ's decision should be reversed because the ALJ (1) failed to give proper weight to the opinions of Plaintiff's treating physicians; (2) failed to consider or misstated material evidence; and (3) erred in his credibility determination.

## FACTUAL BACKGROUND

On June 9, 2005, when Plaintiff was 44 years old, she was involved in a car accident and injured her neck. (R. 238). At the time, she was employed as a gas station manager. She stopped working shortly after the accident and went on short-term disability because she was in pain and felt that she could no longer perform her job. (R. 43-44). Plaintiff has had two surgeries, but she continues to complain of severe pain in her neck and upper extremities. (R. 47-48).

2

**A.     Medical History**

On June 10, 2005, the day after her car accident, Plaintiff went to the Provena Saint Joseph Medical Center emergency room reporting neck pain.  The doctor who examined her noted that she had "moderately paravertebral cervical spine tenderness" and "slight neck stiffness," and that "the range of motion in her neck was limited secondary to pain." (R. 238).  X-rays showed a possible congenital fusion of the vertebral discs at levels C5 and C6 and mild degenerative disc changes at C6-C7, but they did not show any "definite acute changes in the cervical vertebral column," and the neural foramina appeared to be maintained. (R. 240).  Plaintiff was diagnosed with a cervical sprain and given prescriptions for Vicodin (a narcotic pain reliever) and Skelaxin (a muscle relaxant).  (R. 238-39).

Five days later, on June 15, 2005, Plaintiff saw her family physician, Dr. Eileen Heffernan.  She reported that her neck still bothered her and she had numbness in her left arm and soreness in both legs.  She complained that the pain medications made her drowsy and sick.  Dr. Heffernan ordered an MRI and indicated that Plaintiff should be off work for two weeks because she was in pain and could not work while taking her medications.  (R. 214).  The MRI taken on June 20, 2005 showed "at most a mild degree of central stenosis due to a combination of osteophyte formation and disc material and mild ligamentum flavum thickening" at the C6-C7 levels.  The MRI also showed a "partial developmental fusion at the C-5/C-6 disc space level," which the radiologist called an "incidental finding."  The cervical spinal cord appeared normal, and the MRI was otherwise unremarkable.  (R. 206).

A month later, Dr. Heffernan referred Plaintiff to Dr. George DePhillips for a neurological consultation, and Plaintiff saw him on September 12, 2005.  In his report of

that visit, Dr. DePhillips indicated that Plaintiff complained of neck pain as well as pain and numbness radiating into both upper extremities. He also noted that physical therapy was not providing Plaintiff any relief. Dr. DePhillips reviewed the MRI scan, noting that it "reveals a congenital fusion at the C5-C6 level" and "[t]here is disc degeneration with osteophyte formation at the C6-C7 level." He explained that the accident caused an exacerbation of Plaintiff's pre-existing degenerative disc disease with discogenic pain and radiculopathy in both upper extremities, and he also observed foraminal stenosis at these levels, which was aggravated by the accident. Dr. DePhillips recommended a cervical spine epidural steroid injection and a follow-up evaluation in two to three weeks. He further noted that Plaintiff might need surgery if she did not improve with conservative treatment. (R. 263).

On September 27, 2005, Plaintiff underwent an electromyography study of her upper extremities in an attempt to determine the cause of her neck pain and upper extremity pain and numbness. While the study showed that Plaintiff had some carpal tunnel syndrome in her wrists, her left and right ulnar and radial nerves were normal, the cervical paraspinal muscles did not show any acute or active denervation, and the electromyography needle examination of her upper extremities did not reveal any acute changes. (R. 207).

Plaintiff saw Dr. DePhillips again on October 12, 2005. His treatment notes indicate that she had not improved with additional conservative treatment and that she continued to have neck and shoulder pain as well as pain in both upper extremities. Moreover, the cervical epidural steroid injection had aggravated her pain. Dr. DePhillips told Plaintiff that fusion at C6-C7 might be an option, but he also cautioned that the surgery might not help

because she might have some musculoligamentous injury as well.  He referred her to Dr. Michel Malek for a second opinion.  (R. 262).

When Plaintiff saw Dr. Malek on October 17, 2005, she reported having pain in the neck that shoots down both upper extremities to the fingers as well as tingling and weakness in both upper extremities.  She also reported that standing, walking, and washing dishes made her feel worse, but sitting made her feel better.  On physical examination Dr. Malek observed that Plaintiff had "decreased reflexes in the upper extremity" and "mild weakness in the C7 distribution on the left side," but there was no evidence of myelopathy (*i.e.*, a disease or disorder of the spinal cord).  Her sensation was grossly unremarkable, and the rest of the physical exam was within normal limits.  Dr. Malek reviewed the June 20, 2005 MRI and noted that it "shows evidence of congenital fusion at C5-C6, mild bulging at C4-C5, evidence of central spinal stenosis with effacement of subarachnoid space and articulation with the spinal cord at that level."  (R. 204).  He told Plaintiff that she may want to consider having surgical fusion at C6-C7 if her symptoms were incapacitating, though he warned her that there could be an underlying element of nerve damage and musculoligamentous injury that would not improve with surgery.  He noted that they "could consider a discogram to study also the C4-C5 level as well, but at this point [he would] try to limit the fusion to the C6-C7 level given the clinical findings that are consistent with that level and the findings on the MRI scan that support that."  (R. 204-05).

An x-ray on October 26, 2005 showed the congenital fusion at C5-C6 and mild anterior and posterior osteophyte at the levels of C4-C5 and C6-C7.  The cervical vertebral bodies and their posterior elements were otherwise normal, as were the remaining disc spaces.  (R. 226).  When Plaintiff saw Dr. DePhillips again on October 31, 2005, he noted

5

that Dr. Malek was in agreement that Plaintiff's car accident potentially aggravated her cervical spondylosis at C6-C7. Dr. DePhillips again explained that the outcome of surgery is unpredictable and that Plaintiff may have a musculoligamentous injury in addition to the exacerbation of her cervical spondylosis. Plaintiff said she was tired of living with pain and elected to have the C6-C7 fusion. (R. 262). Drs. DePhillips and Malek performed the surgery on November 15, 2005. (R. 219-24).

On November 23, 2005, Dr. DePhillips noted that Plaintiff's wound was healing well. She reported neck pain and discomfort that seemed to be different than the pain she had experienced before surgery, which Dr. DePhillips noted might be the result of disc space distraction during surgery. (R. 262). On December 14, 2005, he prescribed physical therapy 2-3 times per week for 4 weeks. (R. 316).

On December 14, 2005, Dr. DePhillips noted that Plaintiff's x-rays showed excellent interbody fusion occurring at the C6-C7 level, but that Plaintiff was not doing well clinically. She reported neck pain, headaches, and pain and numbness in both upper extremities. (R. 261). She saw Dr. DePhillips again on January 16, 2006 and reported no improvement since the surgery. He put her on Percocet (a narcotic pain reliever) and Valium (a benzodiazepine used to treat anxiety and certain muscle pain) and ordered x-rays to be done in three weeks. Because the physical therapy was aggravating her pain, he instructed Plaintiff to hold off on further therapy until after the x-rays were taken. (R. 261). At that time, Plaintiff had participated in eight physical therapy sessions from December 19, 2005 through January 9, 2006. (R. 303-16). Her physical therapist noted that her pain did not improve, and although there was some small improvement with her range of motion in the cervical region, Plaintiff had not obtained her goals in therapy. (R. 312).

Dr. DePhillips's treatment notes for February 6, 2006 indicate that there was some improvement in the pain and tingling in Plaintiff's left arm, but she had no other improvement in pain since the surgery. X-rays, however, showed excellent interbody fusion. Dr. DePhillips recommended an orthopedic consultation for Plaintiff's shoulders and another visit to Dr. Malek for his opinion. (R. 261).

Plaintiff saw Drs. DePhillips and Malek on March 13, 2006. Dr. DePhillips noted that Plaintiff's only improvement was that her pain was better now with normal activities and when sitting or lying down, whereas before the surgery she had significant pain even at rest. Dr. DePhillips found, however, that Plaintiff was "totally disabled and unable to carry out any meaningful employment." (R. 260). Dr. Malek's treatment notes indicate that the x-rays showed good fusion but that Plaintiff continued to complain of pain in the neck and paraspinal area. (R. 202). He noted that Plaintiff had an orthopedic evaluation and arthrogram and was told by that physician that "there's really nothing particularly wrong with her shoulder." However, the arthrogram aggravated her shoulder condition. Dr. Malek's exam showed no focal deficit, and he noted that her incision had healed well. He recommended having a CT scan with sagittal reconstruction done to check the fusion and an MRI scan of the cervical spine "to make sure that the level next to the fusion is not wearing out from the pressure of the fusion." (R. 202).

Plaintiff saw Dr. Heffernan on April 5, 2006 and complained of continued problems with her neck. Dr. Heffernan noted that Plaintiff had "[f]ailed neck surgery" and that an arthrogram of Plaintiff's shoulder was negative. Dr. Heffernan conducted a physical exam and found that Plaintiff's neck was tender and that she had limited range of motion in her

neck and shoulders.  The treatment notes state that "forms for disability [were] filled out." (R. 213).

Dr. DePhillips's April 26, 2006 treatment notes indicate that Plaintiff underwent a cervical discography that provoked pain at the C4-C5 level.  He noted that "the initial surgery . . . at C6-C7 was performed because of the large herniated disc and that she did not have [a] discography for this reason.  However, the current discogram now reveals discogenic pain at the C4-C5 level where there is a tear in the annulus, which could explain the fact that she did not improve."  He advised Plaintiff to consider another surgery to extend the fusion to C4-C5.  (R. 260).

On May 12, 2006, Dr. Delano Zimmerman prepared a Physical Residual Functional Capacity Assessment of Plaintiff for the Bureau of Disability Determination Services ("DDS").  His assessment was based on his review of Plaintiff's medical records.  Dr. Zimmerman specifically pointed to Dr. Heffernan's April 5, 2006 treatment note indicating that the results of the bilateral arthrogram were negative.  He also cited Dr. Malek's March 13, 2006 notes that the "[a]rthogram shows no particular focal deficit," that the incision from the neck fusion healed well, and that the x-ray showed good fusion.  As for Plaintiff's physical residual functional capacity, Dr. Zimmerman found that she could occasionally lift and carry up to 50 pounds; frequently lift and carry up to 25 pounds; stand, walk, and sit for a total of about 6 hours in an 8-hour day with normal breaks; push and pull without limits other than those for lifting and carrying; climb ramps and stairs frequently; climb ladders, ropes, and scaffolds occasionally; and balance, stoop, crouch, and crawl frequently.  Based on these limitations, Dr. Zimmerman recommended a medium work restriction.  (R. 242-49).

On May 15, 2006, Plaintiff told Dr. DePhillips that the pain had become intolerable and she wanted to proceed with the second surgery. She graded her pain at 8 or 9 on a scale of 1 to 10. (R. 259). Drs. DePhillips and Malek performed the second surgery on May 30, 2006, extending the fusion to C4-C5. In surgery, the doctors observed that the fusion at C6-C7 was excellent. They also found and removed a large spur at C4-C5. (R. 256-57). The surgical pathology report indicates that the specimen was "[f]ibrocartilaginous tissue showing focal degenerative change, clinically C4-C5 disc." (R. 274).

Plaintiff returned to see Dr. DePhillips on June 7, 2006. She was unchanged clinically and continued to report neck pain and pain radiating into both upper extremities. In addition to Valium and Percocet, Dr. DePhillips also prescribed Ultram (a narcotic-like pain reliever) and Mobic (an anti-inflammatory medication). (R. 259). She saw Dr. DePhillips again on June 21, 2006, August 7, 2006, and August 28, 2006. (R. 258-59, 334). X-rays showed "good position of the cage at C4-C5 level with good position of the anterior instrumentation" from the surgery, but she reported that her condition had not improved. (R. 258). Plaintiff complained of neck pain, pain in the left upper extremity, and headaches, but she declined physical therapy and epidural steroid injections. (R. 258-59). Dr. DePhillips prescribed Fiorinal with Codeine (a barbiturate-narcotic pain reliever) for the headaches. (R. 258). Additional x-rays taken on August 29, 2006 showed facet arthropathy from C7 through T1 with no apparent substantial arthritic changes elsewhere. (R. 340).

On September 11, 2006, Dr. Francis Vincent provided a consultative report for DDS, indicating that he had reviewed "all of the evidence in the file" and affirmed Dr. Zimmerman's assessment of May 12, 2006 as written. (R. 319-20).

9

Plaintiff saw Dr. DePhillips again on September 27 and October 18, 2006. Plaintiff continued to complain of neck pain, headaches, pain radiating into both upper extremities with associated numbness and tingling. X-rays showed the fusion at C6-C7 to be solid and complete. Some bone growth was showing at C4-C5, but there was no obvious fusion yet. On September 27, Dr. DePhillips switched Plaintiff's medication from Percocet to Norco (a narcotic pain reliever) to avoid tolerance. On October 18, he scheduled a CT scan to assess the fusion and added Restoril (a sleep aid) to Plaintiff's medications. He noted that Plaintiff's pain below the elbow had resolved since the last surgery. (R. 330, 334).

On November 2, 2006, Plaintiff returned to her family physician, Dr. Heffernan, asking her to complete a form for Advantage 2000 Consultants, Inc. On the form, Dr. Heffernan indicated that Plaintiff suffers from cervical disc disease and reports pain in her arms and neck, headaches, inability to use her right arm for long, and trouble sleeping. Dr. Heffernan noted that at her most recent exam, she found Plaintiff to have a tender lower cervical spine and weak right upper extremity. Dr. Heffernan then circled or checked various responses on the form regarding Plaintiff's abilities and limitations, indicating that Plaintiff: is able to sit, stand, and walk for less than 1 hour in an 8-hour day; cannot use her right hand for repetitive grasping, pushing, pulling, or fine manipulation; can use her left hand for grasping and fine manipulation, but not pushing or pulling; cannot use her feet for repetitive movements as in operating foot controls; can never lift or carry 0-4 pounds; and is unable to bend, squat, crawl, climb, reach above, or reach at shoulder level. Dr. Heffernan indicated on the form that Plaintiff is totally restricted from activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and

gases. As for any other restrictions, Dr. Heffernan wrote that Plaintiff "is on pain meds and can't work." (R. 321-22). In her progress notes, Dr. Heffernan indicated that Dr. DePhillips might need to perform a third surgery. (R. 323).

A report of a CT scan taken on November 15, 2006 indicated that the hardware placed at C4 through C7 during Plaintiff's surgeries "limit[ed] the evaluation of the adjacent bony and soft tissue anatomy at these levels," but "[n]evertheless, no definite disc herniation [was] seen." The report indicated that "mild reduction in [the] spinal canal caliber at [the] C6-C7 level" was observed, and an MRI might be of benefit. (R. 339).[1] Dr. DePhillips's November 20, 2006 treatment notes indicate that the fusion appeared to be taking very well. Plaintiff, however, complained of pain and said that it reached a level of 10 without medication. She reported that the pain was primarily on the right side neck and shoulder with right temporal headaches as well as pain radiating into both upper extremities to the elbow. Dr. DePhillips indicated that Plaintiff would return in January, and anticipated that, at that time, he would declare "maximum medical improvement and release her with permanent disability." (R. 328).

Dr. DePhillips's progress notes of February 12, 2007 indicated that Plaintiff still had not improved clinically. She reported her pain to be a 10 with localized pain to the right side of the cervical spine beginning in the lower cervical area radiating upward and pain radiating into the right shoulder and arm. Dr. DePhillips prescribed Valium, Norco, and Fiorinal with Codeine. In his notes, he indicated that Plaintiff has degenerative disease in

---

[1]	The record also includes the report of another person's cervical MRI scan taken on the same day, which the ALJ mistakenly included in his discussion of the medical evidence instead of Plaintiff's report. (R. 33, 338).

the right shoulder, but it is not severe enough to require medical treatment. With respect to her neck, he also noted that she had lost cervical mobility, was able to rotate 35 degrees to the left and 25 degrees to the right, and exhibited extension to 10 degrees and flexion to approximately 30 degrees. According to Dr. DePhillips, "[d]ue to patient's loss of cervical mobility as a result of chronic pain and the multiple level cervical fusion, she remains unemployable and disabled to return to work." In addition, her loss of mobility makes it "difficult for her to drive more than just short distances and locally making it even more difficult to return to work in any capacity." Dr. DePhillips copied Cigna Disability Insurance on the progress note. (R. 328).

Also, on February 12, 2007, Dr. DePhillips completed a disability certificate stating that Plaintiff needed to be excused from jury duty due to her condition and the fact that she is unable to sit for long periods of time. (R. 326). Three days later, he completed a continuing disability form stating that Plaintiff has degenerative cervical disc disease and is unable to perform any occupation. Dr. DePhillips noted that Plaintiff's condition had not improved with two surgeries. He characterized her prognosis as "fair/regular," and stated that she would be able to attend to some of her occupation in 6-12 months. (R. 325). Around this same time, Dr. Heffernan also prepared a doctor's note stating that Plaintiff is "totally disabled [f]rom Nov 16 - Present," has "severe neck pain," and had a "failed surgery." (R. 344).

On March 21, 2007, Dr. DePhillips indicated that Plaintiff still had not experienced any improvement in terms of pain, which she rated as a 10. Dr. DePhillips reviewed a CT scan taken on February 20, 2007 and noted that "[a]t the C4-C5 and C6-C7 level[s] there is clearly evidence of interbody bone growth and fusion with no evidence of

pseudoarthrosis." He further stated that in his opinion Plaintiff "has chronic pain related to the motor vehicle accident, which is permanent and has resulted in disability." (R. 188).

Dr. DePhillips's treatment notes for April 18, 2007 and May 30, 2007 indicate that Plaintiff continued to suffer neck pain and headaches. In April, he switched her medication from Kadian (a narcotic pain reliever made of morphine sulfate), which was not giving her relief, to Oxycontin (another narcotic pain reliever). She was also taking Norco and Fiorinal with Codeine at that time. In May, Dr. DePhillips noted that Plaintiff had developed progressively worsening bilateral upper extremity numbness and tingling. He recommended a CT scan "to make certain there is a solid fusion and not a pseudoarthrosis which could explain her worsening upper extremity paresthesia." (R. 188).

A June 5, 2007 CT scan of Plaintiff's cervical spine revealed no significant change compared to the previous study of February 20, 2007. The CT scan showed that her "[o]verall vertebral alignment is satisfactory," but "there is a mild spurring seen about the anterior discovertebral margin C6-C7 level" and "[m]ild degenerative changes are noted about the uncovertabral joints C3-C4 with consequent neuro-exit foraminal encroachment (mild)." The report indicates that "[t]he bony elements are otherwise intact" and "[n]o disc herniation [was] seen." (R. 105).

On August 10, 2007, Plaintiff started seeing Dr. Samir Sharma of the Pain & Spine Institute for medication management. (R. 191-93). Dr. Sharma noted that Plaintiff was doing well on her current medication regime, but at a September 10, 2007 visit, Plaintiff reported that she felt the pain had increased over the past 2 to 3 weeks due to developing tolerance to the medications. (R. 184-86.) Plaintiff characterized her pain as constant, moderate in intensity, aching, and stabbing. Dr. Sharma noted that aggravating factors

13

may be twisting, prolonged positions, sitting, standing, and walking.  His treatment notes further indicate that Plaintiff denied having "radicular arm pain, radicular leg pain, numbness in the arms, numbness in the legs, weakness in the arms and weakness of the legs."  (R. 184).  Plaintiff reported that she had some relief with rest, stretching, non-steroidal anti-inflammatory drugs, and muscle relaxants, but the pain worsened with activity, head flexion, and head rotation.  Dr. Sharma's exam revealed that palpation elicited pain over the bilateral C3, C4, C5, and C6 facet joint and bilateral occipital ridge.  Plaintiff had full active and passive range of motion, however, and compression and Spurling tests[2] were negative.  Her deep tendon reflexes and muscle strength were also normal.  In August and September 2007, Dr. Sharma wrote prescriptions for refills of Ambien (a sleep aid), Lidoderm adhesive patches (for pain), Norco, and Oxycontin, and in September 2007, he increased the dose of Oxycontin from twice a day to three times a day.  (R. 186).

An MRI taken on October 22, 2007 revealed "[f]ocal right spondylosis at C4-C5 with moderate right foraminal narrowing but not central canal stenosis" and "[m]ild spondylosis acctic to left at C3-C4 with mild left foraminal narrowing."  (R. 385).  A few months later, on January 14, 2008, a CT scan showed "[o]verall no significant change compared to the previous study."  The report notes that hardware installed during the two earlier surgeries "is obscuring portions of the adjacent bony and soft tissue anatomy at the [C4-C7] levels and limiting the evaluation."  Nevertheless, the scan showed "[d]egenerative changes . . . at the uncovertebral joints of C3-C4 with mild neuro-exit foraminal encroachment" and

---

[2]      A "Spurling test" is an "evaluation for cervical nerve root impingement." (http://www.medilexicon.com/medicaldictionary.php?t=90833, last viewed on April 26, 2011).

"mild spurring . . . along the posterior discovertebral margin at C4-C5 and C6-C7 levels." (R. 374).

Dr. DePhillips reviewed the CT scan with Plaintiff on January 30, 2008, noting that all of the interbody fusions from C4-C7 appeared to be solid. Plaintiff still complained of headaches and right-side neck pain, so Dr. DePhillips discussed "the possibility that some of her pain could be from the facet arthropathy at C3-C4 and C7-T1 levels." He recommended "temporar[y] [medial] nerve branch blocks" to see if they provided any relief. He also recommended that Plaintiff not return to work, stating: "In my opinion she is unemployable and permanently and totally disabled. This is based on the multiple surgical fusions that she underwent as well as her chronic pain syndrome and the fact that she will require further treatment. She has lost cervical mobility also as a result of the injury and surgical procedures, which limit her movements and render her unemployable along with her chronic pain." (R. 187).

On February 6, 2008, Dr. Sharma stated that Plaintiff has "reached the [maximum medical improvement] and is not employable according to her job description at this time." Dr. Sharma also stated that Plaintiff "is not to return to work due to her multiple surgical fusions as well as her chronic pain syndrome," noting that Plaintiff "does require further ongoing treatment," and "has lost cervical mobility as a result of the injury and surgical procedures, which limits her movements." (R. 189).

Plaintiff had a follow-up visit with Dr. Sharma on May 21, 2008. The treatment notes indicate that Plaintiff was stable on her current medications (Remeron Soltab, Morphine Sulfate, MSIR, and Zanaflex), but she still rated her pain at a 6-8, with pain primarily in the posterior neck and right lower extremity. Dr. Sharma's notes state that Plaintiff was under

15

"continuous restriction of total work day of 3-4 [hours]," and that Plaintiff "will also require . . . rest supine every 15-20 minutes and . . . a recumbent chair to off-load cervical strain." Dr. Sharma's exam revealed that palpation elicited pain over the bilateral C3, C4, C5, and C6 facet joint and bilateral occipital ridge. Plaintiff's compression test was negative, but she had limited active and passive range of motion, her swallowing test was positive, and her Spurling test was "positive right." Dr. Sharma prescribed refills of Remeron Soltab (an antidepressant), Morphine Sulfate (an opioid analgesic pain reliever), and MSIR (an immediate release oral morphine). (R. 194-96).

**B.    April 15, 2008 Hearing**

**1.    Plaintiff's Testimony**

Plaintiff, who was 46 at the time of the hearing, testified that she lives with her ex-husband, her youngest daughter, her son, her son's fiancee, and her grandchild. (R. 42). She is left-handed and has an eleventh grade education. (R. 43). At the time of the car accident, she was a manager at a gas station. (*Id.*). She testified that she stopped working on June 16, 2005 because she was in too much pain and could not perform her job. (R. 43-44). Prior to working as a gas station manager, she loaded and unloaded semi-trucks at a popcorn factory. (R. 44).

With respect to her neck condition, Plaintiff testified that the doctors "fused four of [her] discs" and "now the ones above and below what they fused are starting to bulge out a little." (R. 45). She said she has a lot of pain and the problems with her neck affect her ability to walk, stand, sit, lift, and carry. (R. 45-46).

Plaintiff testified that she was on her way to see Dr. Heffernan when the accident occurred. (R. 46). Following the accident, Dr. Heffernan prescribed pain medication, and

16

then later she started seeing Dr. DePhillips, a neurosurgeon. (*Id.*). She saw Dr. DePhillips about every four to six weeks for her neck, and she continued to see Dr. Heffernan about every six weeks for other things. (R. 46-47). Dr. DePhillips sent her for x-rays, prescribed medications, and performed both of her surgeries. (R. 47-48). She testified that she continues to see him for follow-up care, and that in January he told her that the discs above and below the areas where she had surgery were starting to bulge a little bit. (R. 48). Plaintiff testified that her pain is no longer just in her neck; it goes down into her right shoulder and the numbness goes all the way down to her fingers. (*Id.*). According to Plaintiff, Dr. DePhillips restricted her to lifting or carrying no more than 10 pounds and limited her driving to only the doctor's office and grocery store.[3] (*Id.*).

Plaintiff testified that on a typical day she wakes up at 4 or 5 in the morning and sits in her recliner and watches television. (R. 49). She basically lives in her pajamas, though she was able to dress herself for the hearing. (R. 50-51). She no longer showers everyday because "it hurts too bad." (R. 51.) Plaintiff said she does a little housework, including dry mopping the floor, but she has to sit down and rest after dry mopping one room. (R. 50). Her daughter typically helps her to prepare meals, but Plaintiff can make simple meals, (*e.g.,* microwave oatmeal and sandwiches). (R. 50-51). Her daughter also helps with the grocery shopping and laundry. Plaintiff can separate the laundry and put it into the washer, but her daughter carries the laundry downstairs and brings it back up when it is done. (*Id.*). Plaintiff can load the dishwasher, but she cannot vacuum. (*Id.*). She said she used to garden, but now she can only do a little bit of weeding before she has to stop due to pain.

---

[3]     The record does not include any documents reflecting these restrictions.

(R. 51-52).  Plaintiff does not do any exercise or physical therapy.  (R. 52).  She testified that she goes to bed around midnight when her sleeping pills start to take effect, but she wakes up after about four hours because she starts to feel pain and needs to move.  After moving around, she is awake and cannot go back to sleep.  (R. 50).

With respect to her symptoms, Plaintiff testified that she has pain in the upper part of her back that reaches up into her head.  (R. 52).  She said she has constant pain in her right ear and it shoots down her right shoulder and into her upper arm.  (*Id.*).  She also has numbness in her right and left arms extending down to her fingertips, which she described as being "like when your leg falls asleep or something – tingling."  (R. 52-53).  Plaintiff complained of constant tingling in the left shoulder and numbness, and testified that if she moves her head the wrong way, she gets pain that shoots all the way down to her toes.  (R. 53). The shooting pain is made worse with activity, and nothing helps to relieve her pain except medication.  (*Id.*).  She takes Morphine Sulphate, 60 milligrams twice a day and 30 milligrams every four hours, and a sleeping medication.  (R. 49).  The morphine helps if she is just sitting, but if she "start[s] doing stuff," she "just ha[s] all the pain."  (*Id.*).

Plaintiff estimates that the most she can lift is five pounds, explaining that her granddaughter weighs six pounds, and it hurts to hold her.  (R. 54).  She estimates that she can walk for about 10 to 15 minutes in an 8-hour day and stand for about 10 minutes.  (*Id.*).  She also said she can sit for a while, but in a chair like the one she sat in at the hearing, she can sit for only about 5 minutes because she needs to have something that supports her head and back.  (*Id.*).  Plaintiff can drive, but it hurts to operate the steering wheel.  She testified that "[a]nything that has to do with working [her] arms or [her] hands hurts."  (R. 54-55).

18

## 2. VE's Testimony

The ALJ asked the vocational expert, Pamela Tucker, whether someone within "the age range of 43-36"[4] with an eleventh grade education and the same past work experience as Plaintiff, who is limited to light work and who can occasionally climb ladders, ropes, or scaffolds, frequently climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl, would be able to perform Plaintiff's past work as a gas station manager or a loader. The VE answered no, explaining that a gas station manager position is considered medium, skilled work and a loader position is considered heavy, semi-skilled work. (R. 56-57). The VE testified, however, that the individual would be capable of performing work at an unskilled, light level, including the work of an assembler (approximately 4,000 positions), a cashier (approximately 38,000 positions), and a light packer (approximately 14,000 positions). (R. 57-58). According to the VE, there are approximately 92,000 light jobs and 12,000 sedentary jobs in the region that would accommodate someone with these restrictions. (R. 58). The VE further testified that if Plaintiff's testimony was found to be totally credible and her impairments fully supported by the medical evidence, "there would not be any jobs available based on her testimony of pain complaints and her inability to sustain a total eight hour work day." (*Id.*).

---

[4]  It is unclear if this is a transcription error and, if so, what age range the ALJ incorporated into the hypothetical question he posed to the VE and whether the range encompased Plaintiff's age (46 at the time of the hearing). (R. 42). Plaintiff notes this apparent mistake in her motion, but she does not argue that it is a basis for reversal of the ALJ's decision. (Doc. 19, at 3).

## C.    ALJ's Decision

The ALJ found that Plaintiff was not disabled from June 16, 2005, the date of the alleged onset, through October 10, 2008, the date of the ALJ's decision.  (R. 36).  In applying the five-step analysis required by 20 C.F.R. § 404.1520(a), the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 16, 2005.  (R. 28). He then found that Plaintiff's discogenic and degenerative disorders are severe impairments, but that they do not meet or medically equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 28-29).  Next, the ALJ concluded that Plaintiff retains the residual functional capacity to perform light work involving frequently lifting and/or carrying no more than 10 pounds, occasionally lifting and/or carrying no more than 20 pounds, standing and walking for approximately 6 hours in an 8-hour workday, and sitting for at least 2 hours in an 8-hour workday.  (R. 29).  The ALJ stated that "[o]ther limitations include: frequent climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; and occasional climbing of ladders, ropes, or scaffolds."  (*Id.*).

In making this determination, the ALJ stated that "[t]he record contains inconsistencies that bring the claimant's credibility into question," and that her "subjective allegations regarding the nature and severity of the claimant's impairments are not generally in accord with the medical evidence of record."  (R. 31).  The ALJ specifically noted that an orthopedic specialist told Plaintiff that there is really nothing wrong with her shoulder.  (*Id.*)  The ALJ also observed that Plaintiff's daily activities are inconsistent with her complaints of disabling symptoms and limitations, noting that she dresses, grooms, and bathes herself, prepares simple meals, grocery shops (but not by herself), does laundry (but she does not carry it), dry mops the floors, and loads the dishwasher.  (*Id.*).  He also

found Plaintiff's testimony that she sits in her recliner most of the day to be inconsistent with her report that she cannot sit for 10 minutes without experiencing pain. (*Id.*). Further, the ALJ stated that "the objective medical evidence does not fully support and is inconsistent with the claimant's subjective complaints," noting that the "MRIs, EMG/NCS, and other x-rays and tests . . . have all been rather unremarkable." (*Id.*).

The ALJ stated that "[a]s far as opinion evidence," he gave consideration to "the reports of the state agency medical consultants as well as to other treating, examining, and non-examining medical sources." (R. 33). The ALJ noted that the agency consultants did not examine Plaintiff and therefore their opinions are not entitled to as much weight as those of a treating physician. However, he determined that the agency consultants' opinions "deserve[d] some weight, particularly in a case like this in which there exists a number of other reasons to reach similar conclusions." (*Id.*).

As for opinions of Plaintiff's treating physicians, the ALJ acknowledged that Dr. Heffernan determined that Plaintiff can sit, stand, or walk for less than one hour in an 8-hour day, that she cannot lift even 0-4 pounds, and that she is on pain medication and cannot work. (*Id.*). He also acknowledged that one of Plaintiff's treating physicians stated that Plaintiff remains "unemployable and disabled to return to work" as the result of her degenerative disc disease and post two surgeries.[5] (*Id.*). However, the ALJ discounted these opinions, referring to Dr. Heffernan's as a "fill in the blank opinion," and stating that the opinions are inconsistent with the diagnostic testing and other evidence and appear to be based on Plaintiff's subjective complaints regarding pain. (*Id.*).

---

[5] The ALJ attributed this statement to Dr. Heffernan, but the statement was made by Dr. DePhillips. (R. 33, 328).

The ALJ also discredited Dr. Heffernan's April 5, 2006 report of Plaintiff's visit to the Joliet Doctors Clinic, which documented decreased range of motion in the cervical and shoulder area. (*Id.*). The ALJ again noted that the doctor's findings appear to be based on Plaintiff's subjective reports. He also stated that "[t]he record suggests that the claimant sought treatment primarily in order to generate evidence for this application and appeal, rather than in a genuine attempt to obtain relief from the allegedly disabling symptoms," based on evidence that Dr. Heffernan filled out disability forms. (*Id.*). The ALJ did not specifically address the opinions of Dr. DePhillips or Dr. Sharma.

Finally, the ALJ stated that another factor influencing his decision was Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing." (R. 34). The ALJ found her to be "less than fully credible," noting that "[d]espite alleging an inability to sit for any sustained period of time, she testified she can only sit for five minutes in an eight hour day . . . , [she] managed to sit through the hearing, which lasted for a much longer period, without exhibiting any sign of discomfort." (*Id.*).[6]

Based on these factors, the ALJ concluded that "while [Plaintiff] undoubtedly may experience some pain, limitations, and restrictions from her impairments, the medical record in its entirety demonstrates that [she] has no greater limitations in her ability to perform work activities than those reflected in the residual functional capacity reached in this decision." (R. 34). The ALJ also found that Plaintiff's "medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are

---

[6]     The transcript reflects that the hearing lasted for approximately 25 minutes. (R. 39, 59).

not credible to the extent they are inconsistent with the residual functional capacity assessment assessed herein." (*Id.*).  Relying on the testimony of the VE, the ALJ determined that, although Plaintiff was unable to perform her past work, there were a significant number of jobs in the national economy that she could perform.  (R. 35-36).  Accordingly, the ALJ concluded that Plaintiff was not disabled, as defined under the Social Security Act, from June 16, 2005 through the date of his decision, October 10, 2008.  (R. 36).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted).  The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)).  Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue,* 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted).  The Court must critically review the ALJ's decision to

ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936 940 (7th Cir. 2002)).

**B.    Disability Standard**

In order to qualify for DIB or SSI, Plaintiff must be found "disabled" under the Social Security Act. 42 U.S.C. §§ 423(d), 1381a. A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d), 1382c(a)(3)(A). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:  (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000). In order to determine whether the claimant can perform any past relevant work (step four), the ALJ assesses the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1545, 416.945. The RFC is defined as the most that an individual can do in light of the physical and mental limitations that affect her ability to perform work-related activities. *Id.*

**C.      Analysis**

In her motion, Plaintiff argues that the ALJ's decision should be reversed because the ALJ (1) did not give proper weight to the assessments of her treating physicians; (2) failed to consider or misstated material evidence; and (3) erred in finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible.   Each argument is addressed below.

**1.      Treating physicians**

A treating physician's opinion concerning the nature and severity of a plaintiff's injuries is entitled to controlling weight if it is adequately supported by objective medical evidence and is consistent with other substantial evidence in the record.   20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010).   If the ALJ discounts the opinion of a treating physician, the ALJ must offer "good reasons" for doing so.   *Id.*   The ALJ then must go on to determine what, if any, weight to give the opinion using the factors listed in 20 C.F.R. § 404.1527(d)(2), including the length and frequency of treatment, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion.   *Id.* at 308; *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010).

Plaintiff first argues that the ALJ's decision should be reversed because he "made no mention whatsoever" of Dr. Sharma or his treatment records.   (Doc. 19, at 11).   The Court agrees.   Plaintiff saw Dr. Sharma at least three times between August 2007 and May 2008 for pain medication management.   (R. 184-86, 191-96).   On May 21, 2008, Dr. Sharma stated that Plaintiff "is under a continuous restriction of total work day of 3-4 [hours]" and "will also require . . . rest supine every 15-20 minutes and . . . a recumbent

25

chair to off-load cervical strain." (R. 194). Dr. Sharma also noted that on physical examination, Plaintiff's swallowing and Spurling tests were positive and she had limited active and passive range of motion. (R. 195). The ALJ was required to consider this opinion and determine what weight to give it, but he did not even mention it in his decision. This is a concern because Dr. Sharma imposed specific work restrictions that the ALJ did not discuss when determining Plaintiff's RFC or questioning the VE about Plaintiff's ability to perform certain work. Because proper consideration of this evidence may have caused the ALJ to reach a different decision, the case must be remanded.

Plaintiff also argues that the ALJ erred in his evaluation of Dr. Heffernan's opinion. Specifically, Plaintiff asserts that the ALJ "minimized the length of treatment and frequency of examination." (Doc. 19, at 11). Plaintiff saw Dr. Heffernan, her primary care physician, approximately one week after her car accident, at which time Dr. Heffernan gave her a prescription for pain medication. (R. 46). A few months later, Dr. Heffernan referred Plaintiff to Dr. DePhillips for a neurological consultation, and after that, Plaintiff began seeing Dr. DePhillips regularly regarding her neck condition. She also continued to see Dr. Heffernan on a regular basis primarily for other health concerns, but Dr. Heffernan's records include information regarding Plaintiff's neck condition. (R. 46, 213, 321-23).

On November 2, 2006, Dr. Heffernan completed a form for Advantage 2000 Consultants, Inc., indicating that Plaintiff complained of pain in her arms and neck, headaches, inability to use her right arm for long periods, and trouble sleeping. (R. 321). Dr. Heffernan also noted that Plaintiff's examination revealed a tender lower cervical spine and weak right upper extremity. (*Id.*). Dr. Heffernan then circled or checked various responses on the form regarding Plaintiff's abilities and limitations, indicating, among other

26

things, that Plaintiff's ability to sit, stand, and walk was limited to less than 1 hour in an 8-hour day, that Plaintiff could not lift or carry 0-4 pounds, that she could not bend, squat, crawl, climb, reach above or at shoulder level, and that she had limited functions of her hands.  (R. 321-22).  Dr. Heffernan also stated that Plaintiff "is on pain meds and can't work."  (R. 322).

The ALJ discussed this opinion in his decision, but he did not go through the analysis required by the regulations to determine how much weight to give it.  Rather, he gave two cursory reasons for discounting the opinion: that it "seems to be based on the claimant's subjective complaints regarding pain," and that "it is not consistent with the diagnostic testing and other evidence in the file."  (R. 33).[7]  The problem is that the ALJ did not explain why he thought the opinion lacked an objective basis, nor did he identify the allegedly inconsistent evidence.  The ALJ discussed some of the medical evidence elsewhere in his decision, but he failed to point to any specific evidence that he believed was inconsistent with Dr. Heffernan's opinion.  *See Clifford,* 227 F.3d at 872 ("[The ALJ] must build an accurate and logical bridge from the evidence to his conclusion.").  Moreover, even assuming these were good reasons for not giving controlling weight to the opinion, the ALJ still was required to consider the factors in 20 C.F.R. § 404.1527(d)(2) and determine what weight to give it.  *Campbell,* 627 F.3d at 308; *Larson,* 615 F.3d at 751.  The

---

[7]    In discussing Dr. Heffernan's opinion, the ALJ also noted that a statement by a treating physician that a claimant is "disabled" or "unable to work" is not determinative of the issue of whether the claimant is disabled under the Social Security Act.  (*Id.*).  In the Court's view, however, Dr. Heffernan's assessment goes beyond simply opining that Plaintiff is disabled or unable to work.

ALJ failed to do this analysis, and therefore remand is appropriate for this reason as well.[8]

With respect to Dr. DePhillips, Plaintiff objects that "[d]espite his treatment history, expertise, and the corroborative evidence[,] the ALJ gave more weight to the conclusions reached by the [DDS physicians]." (Doc. 19, at 11). The Court agrees that Dr. DePhillips's treatment history and expertise weigh in favor of giving his opinions controlling or substantial weight: he is a neurosurgeon, he performed both of Plaintiff's surgeries, and Plaintiff saw him approximately every four to six weeks from September 2005 through at least May 2007, and continued to see him in 2008.

However, Plaintiff does not identify any particular opinions at issue or explain how proper consideration of those opinions might have resulted in a different decision. And, based on the Court's review of the record, Dr. DePhillips did not offer any opinions to which the ALJ was required to give deference. Dr. DePhillips opined that Plaintiff was "disabled," "unemployable," and "unable to carry out any meaningful employment" (*see, e.g.,* R. 187, 260, 327), but these opinions are not conclusive of the ultimate issue of disability, which is reserved for the Commissioner. 20 C.F.R. § 404.1527(e); *Johansen v. Barnhart,* 314 F.3d 283, 288 (7th Cir. 2002). Dr. DePhillips also opined that Plaintiff's loss of cervical mobility makes it difficult for her to drive "more than just short distances," and that she is "unable to sit for long periods of time." (R. 326, 328). But he did not provide any details regarding these limitations (*e.g.,* how far she can drive or how long she can sit).

---

[8]    The ALJ also did not explain how he arrived at his RFC determination, which is not consistent with the assessments of Dr. Heffernan or the DDS doctors. Although Plaintiff did not raise this issue on appeal, the ALJ should take the opportunity on remand to explain the basis of his RFC finding. *See Briscoe v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005) (finding reversible error where the ALJ failed to explain how the evidence supports his RFC determination).

Consequently, it is not likely that consideration of these opinions would have caused the ALJ to reach a different decision. *See* 20 C.F.R. § 404.1527(d)(3) (the more medical evidence and explanation given by a medical source for an opinion the more weight it is given).

In her reply, Plaintiff emphasizes that Dr. DePhillips's opinions were made "after hands-on observation and treatment which included testing, surgery and medication trials." (Doc. 31, at 2). This may be so, but it does not change the fact that the opinions themselves are either on matters reserved for the Commissioner or so unspecific that they do not provide meaningful input into the nature and severity of Plaintiff's impairment. Therefore, any error the ALJ may have committed in failing to discuss Dr. DePhillips's opinions is harmless. *See Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue,* 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits.").[9]

---

[9]     On December 28, 2008, after the ALJ issued his decision, Dr. DePhillips submitted a letter to the Appeals Council summarizing his treatment and assessment of Plaintiff's condition. In the letter, he states that he assessed Plaintiff's functional capacity in May 2008 and determined that she could sit for only 30 minutes at a time and then needed to be recumbent for 10 to 15 minutes, and that she could sit for a total of 2 to 4 hours per day. (R. 7). The May 2008 assessment is not included in the record or mentioned in the ALJ's decision. If a record of this assessment exists, the ALJ should consider it on remand. As for Dr. DePhillips's December 28, 2008 letter, Plaintiff concedes that it was submitted after the ALJ rendered his decision, and therefore should not be considered as a basis for remand in this case. (Doc. 31, at 3). *See Jirau v. Astrue,* 715 F. Supp. 2d 814, 824-25 (N.D. Ill. 2010) ("Generally . . . any evidence not before the ALJ cannot be considered by the district court as a basis for a sentence four remand.").

### 2.     Failure to consider all material evidence

Plaintiff next argues that the ALJ used evidence selectively and failed to consider and misstated certain material items.  First, she claims that the ALJ "minimized"  her treatment with Dr. DePhillips by discussing only two of her 30 plus visits (including two surgeries) over a three year period.  (Doc. 19, at 9-10).  Plaintiff cites numerous records documenting her visits with Dr. DePhillips, but she does not point to any specific findings in those records that undermine the ALJ's conclusions.  Nor does she explain how minimizing her contact with Dr. DePhillips led the ALJ to an incorrect decision (other than in the context of the treating physician rule, which the Court  discussed above).  The Court fails to see how the sheer number of Plaintiff's visits with Dr. DePhillips alone undermines the ALJ's decision in this case.

Plaintiff also argues that the ALJ "misstated [her] relationship" with her primary care physician, Dr. Heffernan; the ALJ "noted that [she] presented to the Joliet Doctors Clinic on April 5, 2006, and that it appeared to [the ALJ] that she did so only to help generate evidence for her Social Security application rather than in pursuit of pain relief." (Doc. 19 at 10).  Plaintiff argues that the ALJ was mistaken since this particular clinic was where she saw her family doctor, Dr. Heffernan, who treated her on the day of the 2005 car accident and approximately fourteen times thereafter between 2005 and 2007.  The Court is not convinced that the ALJ was confused about the fact that Plaintiff's visit to the clinic was to see Dr. Heffernan, a doctor with whom she had an on-going relationship, or, even if he was, that it would change anything.  The record of the April 5, 2006 visit indicates that Plaintiff complained of continued problems with her neck, that an arthrogram of Plaintiff's shoulder was negative, and that on examination the doctor found that Plaintiff's neck was

tender and she had limited range of motion in her neck and shoulders. The same or similar findings are reported in other records. (*See, e.g.,* R. 202, 242, 274, 328). Accordingly, the Court finds no error in this regard.

Finally, Plaintiff argues that "[w]hile the ALJ does recite portions of the material medical evidence, other portions were [o]mitted without consideration and there are material misstatements about treatment." (Doc. 19, at 10). Plaintiff asserts that these were "significant oversights on the ALJ's behalf," but does not specify what the other material omissions or misstatements are or how they would impact the ALJ's decision. It is well-established that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991); *see also Moss v. Astrue,* No. 09-1196, 2010 WL 2572040, at *5 (C.D. Ill. June 22, 2010). Given that the Court is remanding the case, however, it is worth noting that the ALJ omitted discussion of certain medical records. Because these medical records pertain to Plaintiff's argument that the ALJ erred in finding that she was not fully credible in describing the severity of her symptoms, the Court will address the records specifically in the next section.

### 3. Plaintiff's credibility

In addressing the credibility of Plaintiff's statements regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must first determine whether the alleged severity of the symptoms is supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the

individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id. See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt v. Astrue,* 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel,* 207 F.3d 437 (7th Cir. 2000).

The ALJ found that Plaintiff has a medically determinable impairment that could reasonably produce her symptoms, but he doubted the credibility of her statements regarding their intensity, persistence, and limiting effects. (R. 34). The ALJ based his determination, in part, on his belief that the medical evidence does not support Plaintiff's claim. (R. 31). However, based on the Court's review of the record, the ALJ failed to discuss some of the relevant medical evidence.

For example, the ALJ did not discuss Dr. DePhillips's April 26, 2006 treatment notes which indicated that Plaintiff underwent a discography that provoked pain at the C4-C5 level. Dr. DePhillips's treatment notes stated that the "initial cervical surgery . . . at C6-C7 was performed because of large herniated disc" but her "current discogram now reveals discogenic pain at C4-C5 where there is a tear in the annulus, which could explain the fact that she did not improve." (R. 260). Based on this finding, Dr. DePhillips advised Plaintiff to consider a second surgery to extend the fusion to C4-C5. (*Id.*). The surgery was performed on May 30, 2006, and the surgical report indicated that the doctors found and removed a large spur at C4-C5, which was determined to be "fibrocartilaginous tissue showing focal degenerative changes, clinically C4-C5 disc." (R. 256-57, 274). The ALJ did

not discuss these pre- and post-operative findings in evaluating the severity and limiting effects of Plaintiff's symptoms, even though the discography results led to her second surgery and the pathology report following that surgery showed focal degenerative changes.

Similarly, the ALJ failed to address records of Plaintiff's May 30, 2007 and January 20, 2008 visits with Dr. DePhillips.  In May 2007, a year after Plaintiff's second surgery, Dr. DePhillips indicated that Plaintiff had developed progressively worsening bilateral upper extremity numbness and tingling, and he recommended a CT scan to check for pseudoarthrosis which he thought "could explain her worsening upper extremity paresthesia."  (R. 188).  On January 20, 2008, he reviewed a CT scan taken earlier that month and noted that some of Plaintiff's pain "could be from facet arthropathy at C3-C4 and C7-T1 levels."  (R. 187).  He recommended "temporar[y] [medial] nerve branch blocks" to see if they provided any relief.  He also recommended that Plaintiff not return to work, noting that she had lost cervical mobility which limited her movements and that she would require further treatment.  (*Id.*).

The ALJ also failed to address the fact that throughout the nearly three-year period covered in the records Plaintiff's doctors continued to prescribe a host of narcotic and non-narcotic pain medications (including Percocet, Oxycontin, Morphine, and others), anti-inflammatory drugs, muscle relaxers, and sleeping pills.  Even after Plaintiff's second surgery, her doctor changed and then increased her medications to address her pain.  In Spring 2007, Dr. DePhillips took her off Kadian because it was not relieving her pain and replaced it with Oxycontin, and in September 2007, Dr. Sharma increased the Oxycontin dosage from two to three times a day.  (R. 188, 186).  At the time of the hearing, Plaintiff

was back on a Morphine Sulfate. (R. 49). The ALJ acknowledged that a claimant's use of medication is one of the factors to be considered in assessing the severity of her symptoms (R. 30, 34), but he did not discuss any of this evidence in his decision. *See* 20 C.F.R. § 404.1529(c)(3); *see also Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (noting the improbability that a claimant would undergo extensive and invasive pain-treatment procedures, including taking "heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine," just to increase her chances of getting disability benefits); *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001) (finding the ALJ's credibility analysis flawed for failing to discuss evidence favoring claimant, including the fact that claimant was prescribed a number of prescription medications to alleviate pain and depression); *Wilson v. Barnhart,* No. 03 C 2001, 2004 WL 557356, at *6 (N.D. Ill. Mar. 18, 2004) (finding the ALJ erred by failing to take into account plaintiff's extensive history of treatment for pain, including consistent use of prescription medication, in making his credibility determination).

Although an ALJ is not required to address every piece of evidence, he cannot limit his discussion to only the evidence that supports his ultimate conclusion. *Flynn v. Astrue,* 563 F.Supp.2d 932, 940 (N.D. Ill. 2008) (citing *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994)). He also must "explain why contrary evidence does not persuade." *Id.* In this case, the ALJ omitted discussion of certain medical evidence that was significant enough that it should have been addressed in evaluating Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms. Therefore the case must be remanded. *See, e.g., Ribaudo v. Barnhart,* 458 F.3d 580, 584-85 (7th Cir. 2006) (reversing the ALJ's decision because, among other things, the ALJ did not address medical evidence tending to support plaintiff's contention that he was in significant pain).

34

Plaintiff claims that the case must also be remanded because the ALJ erred in finding that her daily activities do not support her complaints of disabling pain. The ALJ noted that Plaintiff was able to dress, groom, bathe, make something to eat, grocery shop (but not alone), do laundry (but not carry it), dry mop, and load the dishwasher. (R. 31). However, this is not a fair characterization of her testimony. Although Plaintiff testified that she was able to dress herself for the hearing, she also said that she "basically lives in her pajamas." (R. 50-51). She testified that she bathes and grooms herself, but added that doing so causes pain and so she no longer showers everyday. (R. 51). She further testified that when she dry mops the floor, she needs to sit down and rest after completing just one room. (R. 50). These daily activities are "fairly restricted" and do not undermine or contradict a claim of disabling pain. *See Zurwaski,* 245 F.3d at 887 (finding that plaintiff's activities "are fairly restricted (*e.g.,* washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not the sort that necessarily undermines or contradicts a claim of disabling pain"); *Lawson v. Barnhart,* 455 F. Supp. 2d 747, 771 (N.D. Ill. 2006) (finding that plaintiff's activities (*e.g.,* carrying things, opening jars, washing dishes, cleaning the bathroom, sweeping floor, and helping with groceries, taking children to school, and helping with their homework) were "fairly restricted" and did not undermine his claim of disabling impairments); *see also Clifford,* 227 F.3d at 872 ("minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity").

The ALJ also found Plaintiff's testimony that she could sit for no more than 10 minutes without pain to be inconsistent with her testimony that she sits and watches television for much of the day. (R. 31). But Plaintiff testified that she sits in a recliner while

she is watching television, and it is not clear that she was referring to sitting in a recliner, as opposed to some other type of chair, when she limited her ability to sit to 10 minutes a day. (R. 50, 54). In fact, Plaintiff alluded to this distinction at the hearing. When the ALJ asked her how long she was able to sit in a day, she responded that she could sit still for a while unless she moved her arms. (R. 54). When the ALJ asked her how long she could sit in a chair like the one she was sitting in at the hearing, Plaintiff said only five minutes and explained: "Sitting in these kind of chairs, I can't. I have to have something up to where I can support my head and back." (*Id.*). Thus, it is not clear that Plaintiff's testimony is inconsistent on this point.

As another basis for finding Plaintiff "less than fully credible," the ALJ cited her "generally unpersuasive appearance and demeanor while testifying at the hearing." (R. 34). The ALJ explained that "[d]espite alleging an inability to sit for any sustained period of time, she testified that she can only sit for five minutes in an eight hour day; however, the claimant managed to sit through the hearing, which lasted for a much longer period, without exhibiting any sign of discomfort." (*Id.*). The ALJ emphasized that "this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations." (*Id.*). However, aside from Plaintiff's ability to sit through the hearing (which appears to have lasted 25 minutes) without apparent pain, the ALJ did not describe any other observations he made of Plaintiff. The Court does not find this observation alone to be a sufficient basis to uphold the ALJ's credibility finding. *See Powers,* 207 F.3d at 436 (expressing doubt as to the reliability of the "sit and squirm" test but refusing to reverse an ALJ's decision when this observation was but one of several factors that contributed to the ALJ's determination).

36

In sum, the ALJ's credibility determination is not supported by substantial evidence, and therefore the case must be remanded for this reason as well.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 18) is granted and Defendant's Motion for Summary Judgment (Doc. 28) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: May 2, 2011

SHEILA FINNEGAN
United States Magistrate Judge